**In the Matter of T.V. DUKES, Debtor.**

**Larry PHILLIPS and Judy Phillips, Plaintiffs,**

v.

**T.V. DUKES, Defendant and Third Party Plaintiffs,**

v.

**SALEM MORTGAGE COMPANY and Roland A. Benge & Company, Third Party Defendants.**

**Bankruptcy No. 81–00445.
Adv. No. 81–0185.**

United States Bankruptcy Court,
E.D. Michigan, S.D.

Nov. 4, 1982.

Brian I. Brown, Burton, Mich., for debtor.

Robert L. Shegos, Flint, Mich., for plaintiffs/Phillips.

Lee G. Ravitz, Southfield, Mich., for third party defendant/Roland A. Benge and Co.

Michael M. Grand, Birmingham, Mich., for third party defendant/Salem Mortg. Co.

## I

### Introduction

HAROLD H. BOBIER, Bankruptcy Judge.

Debtor, an unmarried elderly man with a 4th grade education, was both untutored and naive. While in the hospital for a heart condition he viewed a television advertise-

ment of Salem Mortgage, a mortgage broker who worked principally for Roland A. Benge & Co., a mortgage lender. Debtor answered the advertisement by calling Salem on a toll-free telephone number. Subsequent to his release from the hospital, debtor was visited by a representative of Salem Mortgage in his home, at which time he made a written loan application to Benge & Company. A loan was subsequently made to debtor in what the lender alleges to be a principal amount of $5,000.00, secured by a first mortgage on debtor's home, at an interest rate of 11% per annum. For its services in finding a willing lender, Salem Mortgage exacted a brokerage fee of $1,344.00, to be paid by debtor directly from the proceeds of the $5,000 loan.

An adversary action was filed by plaintiffs, assignees of the mortgage, to collect the amount owing under the mortgage by debtor; the mortgage broker and mortgagee were joined as third party defendants. This opinion deals primarily with the issues of overreaching by the broker and mortgagee, the exaction of broker's fees as a subterfuge for usurious conduct, alleged violations of the Federal Consumer Credit Protection Act, 15 U.S.C. §§ 1601 *et seq.*, and alleged violations of the Michigan Consumer Protection Act, M.C.L.A. §§ 445.901 *et seq.*

## II

### Findings of Fact

1. Debtor, T.V. Dukes, filed a Chapter 13 petition April 22, 1981, and is an elderly man whose formal education extends only through grade 4.

Salem Mortgage advertised and sold its services as a mortgage broker to procure loans for borrowers, which loans were primarily for personal, family, or household purposes.

Roland A. Benge & Co., is an approved mortgage lender under the provisions of the National Housing Act.

2. In early 1978, while in a hospital for treatment of a heart condition, Dukes viewed a television advertisement of Salem Mortgage, and subsequently placed a phone call to Salem's toll-free number inquiring about obtaining a loan to enable him to visit an ailing uncle in Georgia.

3. In response to Duke's inquiry he was visited at his home by a representative of Salem on May 20, 1978, at which time Salem took a mortgage loan application and entered into a "broker's agreement" with Dukes to "attempt to find a lender" willing to loan Dukes $3,500.00, utilizing his equity in his home as security.

4. The mortgage loan application form was that utilized by Roland A. Benge & Co., the ultimate lender.

5. There is no testimony to contradict the fact that Salem did not engage in an active search for a lender; on the contrary, Salem had an on-going relationship with Benge & Company. A representative of Salem Mortgage conducted the initial interview, prepared all documents necessary to extend the loan, and conducted the closing of the loan at Duke's home on June 7, 1978.

6. Dukes had no contact whatsoever with Roland A. Benge & Co., other than through the representative Salem Mortgage. Salem Mortgage also made the payments required on the vendee's interest in a land contract from the proceeds of the loan in order to enable Roland A. Benge & Co. to acquire a first lien on Duke's home.

7. Salem Mortgage placed between 50 and 60 percent of its loan customers with Roland A. Benge & Company.

8. Mr. Dukes testified that he had hoped to clear at least $1,000.00 in proceeds from the loan after all necessary fees and payments on the land contract were made.

9. Salem, in its broker's agreement, did not state what its ultimate broker's fee would entail; but stated simply that Duke's was seeking a loan for $3,500.00. The full text of the broker's agreement is set forth *infra*. The ultimate broker's fee charged was $1,344.00.

10. Benge's disclosure statement indicates a total amount financed of $5,000.00.

The disbursement sheet (Def. Exhib. H) accounts for this amount as follows:

| | |
|---|---:|
| Land Contract Payoff as of 7/5/78 | $1,710.77 |
| City & County Taxes owing | 608.85 |
| Tax Escrow & Fire Ins. | 255.00 |
| Prepaid Interest (8 days) | 12.24 |
| 6 Months Arrearage | 510.00 |
| Brokerage Fee | 1,344.00 |
| Closing Costs | 156.00 |
| Due Customer (Dukes) | 403.14 |
| Total | $5,000.00 |

11. Benge was on notice and had knowledge that a broker's fee was being charged in this transaction as it was dealing with a broker and paying that broker no compensation itself, it being clear that a broker does not work without compensation. Benge was on further notice due to its regular business dealings with Salem Mortgage Company.

12. Benge failed to disclose the broker's fee as a prepaid finance charge in its Truth in Lending disclosure statement, did not include the fee as a component of the finance charge, and did not include the fee as a component in computing the annual percentage rate.

13. If the broker's fee had been disclosed by Benge in computing the annual percentage rate, that rate would have been greater than the amount actually disclosed in Benge's statement.

14. We also incorporate herein those additional findings of fact made elsewhere in the body of this opinion.

### III

### *Statement of Issues*

A. Whether this court lacks jurisdiction because debtor has failed to exhaust all available administrative remedies.

B. Whether a vendee's interest in a land contract may be utilized as security in a loan transaction, thereby creating a valid mortgage between the vendee and the third party.

C. Whether the debtor is estopped to deny the existence and validity of the lender's first mortgage.

D. Whether the loan transaction violated the provisions of the Michigan Consumer Protection Act, M.C.L.A. §§ 445.901 *et seq.*

E. Whether the brokerage fee paid by the borrower in this transaction can be attributed to the mortgagee as interest, and if so, whether the effective rate of interest charged by the lender exceeded the lawful rate of interest in Michigan.

F. Whether the lender violated the Truth Lending Act by failing to properly disclose the broker's fee as required by Regulation Z.

### IV

### *Discussion of the Law*

#### (A) *Jurisdiction*

Third party defendants Salem Mortgage and Roland A. Benge & Co. argue in their joint brief that this court lacks jurisdiction in this matter because available administrative remedies have not been exhausted. *Attorney General v. Diamond Mortgage Corp.,* 102 Mich.App. 322, 301 N.W.2d 523 (1980). The case cited is, however, inopposite to the present case, as it involved an action to deny, suspend, or revoke a license issued to a real estate broker, an action directly within the authority granted to the Michigan Department of Licensing and Regulation. M.C.L. § 451.213; M.S.A. § 19.803. The present action involves no matters which would require an exhaustion of available remedies pursuant to the Michigan Administrative Procedures Act, M.C.L. §§ 24.264, 24.301, M.S.A. §§ 3.560(164), 3.560(201), and constitutes a civil proceeding related to a case under title 11 of the United States Code so that the Bankruptcy Court possesses jurisdiction by virtue of 28 U.S.C. § 1471(b) and (c).

#### (B) *Existence of A Valid Mortgage*

The initial issue presented in this matter is whether a vendee's interest in a land contract may be utilized as security in a loan transaction, thereby creating a valid mortgage between the vendee and a third party.

Defendant-debtor argues that the first mortgage granted to Benge & Co. was invalid ab inition for the reason that title remained in the vendor on the land contract because the vendor did not execute a release of his lien until some time after the present loan transaction took place. Therefore, debtor continues, lender in this transaction had only a second mortgage interest in the debtor's property for the reason that at the time the loan was executed, debtor had no interest in the property which could be mortgaged. This assertion is without foundation in debtor's brief, and, we believe, without foundation in the law.

■ By way of a general postulation regarding the mortgagability of a land contract vendee's interest, we quote the following passage from 55 Am.Jur.2d, Mortgages, § 111 p. 265:

> The Courts regard as mortgagable both the interest of a vendor of land while the contract for the sale remains executory and no deed has passed and the interest of a vendee under a contract to purchase.

We view this as the proper statement of controlling law in Michigan.

■ The general rule as to what may properly constitute the subject matter of a mortgage is that in order to grant a valid mortgage in property, one must have present valid title, whether legal or equitable, or some other recognized property interest in the property sought to be mortgaged. See 16 M.L.P., Mortgages § 11 p. 313; *Mead v. Pinyard,* 154 U.S. 620, 14 S.Ct. 1205, 23 L.Ed. 501 (1894).

> It is well settled that when land is sold on land contract that the legal title is retained by the vendor and an equitable interest or title is obtained by the vendee. Therefore when a vendee assigns he assigns only what he has, namely an equitable interest. *General Electric Co. v. Levine,* 50 Mich.App. 733, 736, 213 N.W.2d 811, 813 (1973).

Thus, when a vendee purchases under a land contract he acquires equitable title consisting of, among others, the right to compel transfer of legal title upon completion of payment according to the terms of the contract, and sufficient title upon which to base the extension of a mortgage to a third party.

Much of the case law in Michigan is comprised of instances where the court is required to render a determination as to whether an alleged unconditional assignment of a vendee's interest on a land contract was in fact intended to be made only for purposes of security, thereby entitling the vendee to reassignment upon payment of the underlying secured obligation. *General Electric Co. v. Levine,* supra; *Krueger v. Campbell,* 264 Mich. 449, 250 N.W. 285 (1933). The obvious implication of these cases is that a vendee's interest is assignable for purposes of granting a security interest.

We can perceive of no distinction between assignment of a land contract for security purposes, and the present circumstances of accomplishment of the secured transaction by the use of a mortgage agreement; the exception being that when the latter mechanism is employed, the intent of the vendee to grant only a security interest, as opposed to making an outright conveyance, is not subject to later misinterpretation by the parties.

■ In sum, the vendee may properly grant a security interest in his equitable interest in property held subject to the rights of a land contract vendor.

### (C) *Estoppel*

■ The third issue presented for resolution is whether debtor is estopped to deny the validity of Benge's first mortgage where the parties to the loan transaction agreed that part of the loan proceeds were to be used to fully satisfy debtor's obligations to his land contract vendor, thereby allowing Benge to acquire a first mortgage on the real property which passed to debtor upon payment to vendor of the amount owing on the land contract.

This issue is raised by debtor, who argues that because a period of time elapsed between the time Benge was granted a mortgage on the property and the signing of the

deed conveying the property to debtor by the vendor, that Benge's mortgage interest was junior to the lien of the land contract vendee at the time the loan agreement was executed. If this is the case, debtor reasons, Benge & Company's interest was not a first mortgage, would not fall within M.C.L.A. §§ 438.31c(2) and 438.31c(6), which allow a lendor holding a first lien on real estate to charge interest of up to 11%, and Benge & Co. would be restricted to a maximum interest rate of 7% per annum.

The foregoing position of the debtor is untenable. The facts indicate the parties to the loan agreement contemplated that a portion of the loan proceeds would be used by debtor to satisfy his remaining obligations on an executory land contract; this was, in fact, done. The parties further agreed that Benge & Co., was to be granted a first mortgage on the property following payment of the land contract balance to the vendor.

■ This line of argument is misplaced because it assumes that the crucial moment when Benge's lien attached as a first lien was when the vendor *signed* the deed conveying the property to the debtor. However, the accepted rule is that *payment* of the debt upon which the vendor's lien is based, extinguishes the lien. When the vendor accepted payment in full from the debtor-vendee, vendor's lien was extinguished, and there was no longer any lien prior to that held by Benge & Company.

Even if this were not the case, debtor would be estopped from denying the validity of Benge's first mortgage because such a denial would be contrary to the original intent of the debtor. Having once agreed to grant Benge & Co. a first mortgage, debtor may not now deny the existence of its lien or of the priority of the lien.

### (D) *Violations of the Michigan Consumer Protection Act*

The Michigan Consumer Protection Act [MCPA], M.C.L.A. §§ 445.901 *et seq.*, defines unfair, unconscionable, or deceptive methods, acts or practices in the conduct of trade or commerce which are deemed to be unlawful. M.C.L.A. 445.903. The MCPA further defines "trade or commerce" as:

> ... the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes and includes the advertising, solicitation, offering for sale or rent, sale, lease, or distribution of a service or property, tangible or intangible, real, personal, or mixed, or any other article. M.C.L.A. § 445.902(c).

■ We find that Salem Mortgage, advertised and sold its services as a mortgage broker to procure loans for borrowers primarily for personal, family, or household purposes, and therefore is subject to the provisions of the MCPA.

In the present case the services of Salem Mortgage Company were sought by Mr. Dukes as a result of Mr. Duke's desire to obtain funds to visit his ailing uncle in Georgia and a television advertisement in which Salem offered its brokerage services to the general public.

Mr. Dukes made a telephone inquiry by calling the advertised number and was consequently visited in his home by Mr. Trudeau, a representative of Salem Mortgage Company. At this May 20, 1978, meeting, Mr. Dukes gave Mr. Trudeau information necessary to complete a mortgage loan application (Cross Defendant's Exhibit VII), which application was contemporaneously completed by Mr. Trudeau. Interestingly enough, the court notes that the loan application form used by Salem was that of Benge & Co., a third party defendant and the ultimate lender in this transaction. We make an express finding of fact that as of the first encounter between Mr. Dukes and his broker, the broker intended to deal with no lender other than Roland A. Benge & Co., as evidenced by the fact that the application was taken on a Benge & Co. form. This fact also serves as a compelling indication that Salem Mortgage Company was acting as the agent of Roland A. Benge & Co. in this transaction.

During the initial meeting Mr. Dukes also executed a "Broker's Agreement" (Cross Defendant's Exhibit I), which contained the following language:

### BROKER'S AGREEMENT

I HEREBY APPOINT SALEM MORTGAGE COMPANY AS MY AGENT TO ARRANGE A MORTGAGE LOAN FOR ME. I UNDERSTAND SALEM IS A MORTGAGE BROKER AND DOES NOT LOAN MONEY, BUT WILL ATTEMPT TO FIND A LENDER WHO WILL LOAN ME MONEY. I UNDERSTAND SALEM WILL CHARGE ME A BROKER'S FEE AND COSTS IF IT SUCCESS-FULLY ARRANGES A LOAN FOR ME. THE AMOUNT OF THE FEE AND COSTS, AND THE EXACT TERMS OF THE LOAN, WILL BE DISCLOSED BEFORE I SIGN THE LOAN DOCUMENTS. I WILL HAVE NO OBLIGATION TO ENTER INTO ANY LOAN, OR TO PAY SALEM ANYTHING, UNLESS I AGREE TO ALL THE TERMS OF THE LOAN, INCLUDING SALEM'S FEE AND COST. THE AMOUNT OF MONEY NEEDED IS APPROXIMATELY $ _____.

(Check One)

☐ The amount of the loan will be approximately $ 3,500 plus an additional amount to pay Salem's fee and costs. I will pay Salem's fee and costs out of the loan proceeds when the loan is made. I will not retain the entire amount of the loan proceeds because of my obligation to pay Salem its fee and costs. I will have to repay the entire amount of the loan,

☐ The amount of the loan will be approximately $ _____ I will pay Salem its fee and costs out of my own funds when the loan is actually made.

I HAVE READ AND FULLY UNDERSTAND THE ABOVE

The express promise of the broker to "attempt to find a lender who [would loan Dukes] money" implies that Salem did not have a ready lender. This representation was deceptive in that Salem never intended to approach anyone other than Roland A. Benge & Company, as indicated by the fact that the loan application was executed on a Benge & Co. form. At a minimum Salem had a duty not to misrepresent that it would have to search for a lender, when it had a ready lender in Roland A. Benge & Co. at the time the broker's agreement was executed.

■ We hold that the foregoing circumstances constitute a violation of M.C.L.A. § 445.903(1)(cc):

(1) Unfair, unconscionable, or deceptive methods, acts or practices in the conduct of trade or commerce are unlawful and are defined as follows:

(cc) Failing to reveal facts which are material to the transaction in light of representations made in a positive manner.

Salem made a positive representation in the Broker's Agreement that it would be required to search for a willing lender. In fact, the search for a lender by Salem was the very *raison d'être* of the agreement, so it was certainly material to the transaction. The agreement would have been considered unnecessary by Dukes, and probably would not have been entered into had Salem disclosed it had a ready lender. We grant that finding a lender, any lender, is the essence of a mortgage broker's business, but find the positive representation of Salem, in light of the true circumstances, to be a deceptive business practice.

■ The broker's agreement also discloses neither the amount of the fee to be charged, nor a method by which the fee was

to be calculated. It provides only that the amount of the fee was required to be disclosed before the loan documents were signed. This is also a deceptive practice in that the fiduciary, Salem Mortgage Company, failed to provide the borrower-principal with any sort of estimate as to the ultimate charges until a matter of minutes before the borrower was to enter into the loan agreement. Granted, Mr. Dukes had the opportunity to rescind the agreement without obligation for a period of 3-days following the execution of the loan agreement, but Salem nevertheless had an obligation to provide the borrower with an indication as to what the ultimate fee would entail. This information should be available to the borrower at the time the broker's agreement is entered into in order to allow the borrower reasonable time to consider the ramifications of his actions.

The expectation that the borrower is to decide whether or not to proceed with the loan transaction based upon disclosure of the broker's fee at the time of closing is both unfair and deceptive.

This conclusion becomes especially apparent when we consider that in addition to the disclosure statement concerning broker's fee, Mr. Dukes was presented with an incomprehensible number of additional forms to sign at closing: an acknowledgement that he received a copy of the closing statement and paid a broker's fee; an acknowledgement that he had granted a mortgage on his property; a closing statement; a mortgage note; a mortgage agreement; a disclosure statement on the loan from Roland A. Benge & Co.; a notice of opportunity to rescind.

It must also be remembered that all this was being presented to an elderly man, recently released from the hospital and on continuing medication, who was untutored and naive as the result of having the benefit of only a 4th grade education.

While Salem may not have been expected to disclose the exact *amount* of the fee, it is inconceivable to this court that Salem Mortgage Company does not have a standard *method* for computing its fee which could

have been readily disclosed in the original broker's agreement. In analogous brokerage situations, such as in the sale of real estate through a broker, the amount of the fee to be charged is made a part of the listing agreement, commonly as a stated percentage of the sale price. If the fee had been properly disclosed at the time the application was executed, it would have allowed time for the debtor to seek advice from an advisor or his attorney. Certainly he would have been advised not to pay such a scandalous fee.

In light of these facts, we hold that Salem Mortgage engaged in unfair and deceptive trade practices in the conduct of this transaction, as defined in M.C.L.A. § 445.-903(1)(*o*), (s), and (x):

(*o*) Causing a probability of confusion or of misunderstanding as to the terms or conditions of credit if credit is extended in a transaction.

(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer.

(x) Taking advantage of the consumer's inability to reasonably protect his interests by reason of disability, illiteracy, or inability to understand the language of an agreement presented by the other party to the transaction who knows or reasonably should know of, the consumer's inability.

■ We further hold that Salem Mortgage violated M.C.L.A. 445.903(1)(z) by:

(z) Charging the consumer a price which is grossly in excess of the price at which similar property or services are sold.

An expert witness called by Mr. Dukes testified that a bank would typically charge 3% of the mortgage loan amount as a fee consisting of approximately a 1% commitment fee and a 2% closing fee. The closing fee consists of what the bank determines to be a reasonable fee for document preparation, while commitment fee is the amount it will have to pay secondary investors supply-

ing funds for the loan for the use of their money. On cross-examination the expert also testified that a $5,000.00 loan would typically generate so-called "out-of-pocket" expenses of approximately $450.00

With the foregoing in mind, and considering the fact that the true amount loaned to Mr. Dukes was $3,500.00,[1] the total fees on such a loan should be approximately $370.00 consisting of the following: 3% of the loan amount for the commitment fee and closing costs, and $300.00 as out-of-pocket expenses. The $300.00 figure is arrived upon by using $450.00 testified to by the expert as out-of-pocket expenses on a $5,000.00 loan, and reducing it by one-third, to reflect the amount of Mr. Duke's loan of $3,500.00. The $405.00 figure would also have to be reduced by 1%, as there is no evidence that a commitment fee was paid. Thus, a reasonable amount to exact for fees in this loan transaction was $370.

We also note that $156.00 was charged Mr. Dukes as fees for recording/filing fees; fees for title examination, abstract of title, or title insurance; fees for preparation of deeds, settlement statements, disclosure statements, or other documents, and; an appraisal fee. These charges appear to cover the costs included in what is usually termed the "closing fee" of 2% as testified to by the expert.

The amount of the broker's fee charged by Salem Mortgage Company in the present transaction was $1,344.00, or 38.4 percent of the amount loaned. When the figure of $156.00 of additional charges outlined above is added to this figure, the total cost to Mr. Dukes in fees on his loan was $1,500.00, or 42.9% of the $3,500.00 amount loaned.

Given the foregoing finding that $370.00 constitutes a reasonable amount for fees on a loan such as that presently before the court, the remaining $1,130.00 charged Mr. Dukes must represent the pure or net broker's fee exacted by Salem Mortgage for its services in bringing Mr. Dukes together with Roland A. Benge & Company.

While a mortgage broker is certainly entitled to receive compensation for its efforts, $1,130.00 is 32.2% of the $3,500.00 loaned, and approximately three times more than the reasonable closing costs.

We hold that this amount is grossly in excess of the price for which similar services are sold and patently unconscionable under the Michigan Consumer Protection Act.

### (E) *Usury*

The next issue raised by the parties is whether the broker's fee paid by Dukes to the mortgage broker can be attributed to the mortgagee as interest, thereby effectively increasing the rate of interest to a level above the lawful rate, rendering the transaction usurious.

> The rights and duties of a broker employed to secure a loan depend upon the same principles which govern the broker who undertakes to find a purchaser of property. The loan broker is entitled to his commissions when he has procured a lender who is ready, willing, and able to lend the money upon the terms proposed.

*Secor v. Patterson,* 114 Mich. 37, 40, 72 N.W. 9 (1897).

The foregoing general rule applies only in the usual case where the mortgage broker is the agent of the borrower; the rule is subject to modification where the broker is found to be the agent of both parties or the agent of the lender:

> The great weight of authority is that a loan is not rendered usurious by the lender's agent charging the borrower, for his own benefit, a commission or bonus for procuring the loan, in excess of the maximum legal rate of interest, where such charge is made without the lender's knowledge or consent, either expressed or implied, and is not ratified or shared by him. 21 A.L.R. 841, note. However, such knowledge and consent may be implied from circumstances. While not conclusive, circumstances held to be of weight, both of which are present at bar, are

---

1. $5,000.00 less: $1,500 broker's fee's and costs.

blood relationship between the lender and agent (*Franzen v. Hammond,* 136 Wis. 239 [116 N.W. 169, 19 L.R.A. (N.S.) 399, 128 Am.St.Rep. 1079]; *Rogers v. Buckingham,* 33 Conn. 81); and the fact that the lender paid the agent no compensation for his services (21 A.L.R. 860). *Freedman v. Katz,* 246 Mich. 296, 299, 224 N.W. 325 (1929).

■ The burden of proving a prima facie case is on the mortgagor, who must establish a general loan agency between the mortgagee and the broker, and show that the broker's commission, together with the contractual rate of interest, is in excess of the legal rate. Once this has been established, the burden shifts to the mortgagee to prove that his agent took the fee for his own benefit, not for the benefit of the principal, and without the lender's knowledge or consent. *Freedman v. Katz, id.*

■ Based upon the facts and discussion set forth below, this court holds that T.V. Dukes has met the burden of proving a prima facie case by establishing a loan agency relationship between the mortgagee and the broker as required by *Freedman v. Katz, id.* The holding in the *Freedman* case indicates that in determining whether a broker can be deemed an agent of a particular lender, a court must examine the facts surrounding the transaction in question. If in the sound judgment of the court the cumulative effect of the evidence presented indicates that the party claiming to be a mere broker, in fact had a closer relationship or far more authority than that of simply bringing the borrower and lender together, the court may deem the broker to be the agent of the lender.

In the present case a representative of Salem Mortgage Company conducted all meetings and negotiations concerning the loan with Mr. Dukes. Mr. Dukes had no contact whatsoever with Roland A. Benge & Co., the lender. While the taking of the original loan application does not, without more, serve as an indicator of an agency relationship, the fact that Salem Mortgage took the application on a Roland A. Benge & Co. form is a strong indication of such a

relationship. Salem Mortgage also prepared and executed all documents necessary to the transaction, including disclosure statements, the mortgage note and deed, the closing statement, and the opportunity to rescind. Salem Mortgage also conducted the closing of the loan on June 7, 1978, at Mr. Duke's home. In addition, the payment to the land contract vendor was made by Salem Mortgage, not Roland A. Benge & Co.

While the court does not wish to rule out the sufficiency of the foregoing facts, when taken alone, to establish an agency relationship, the instant case presents us with the additional fact that 50 to 60 percent of the total loans placed by Salem Mortgage Company for its customers were placed with Roland A. Benge & Co. We cannot conceive of a closer relationship between Salem and Benge; the two companies were a virtual identity, and a finding that Salem Mortgage was the agent of Roland A. Benge & Co. is clearly supported by the evidence.

The court also finds that the broker's fee was charged by Salem Mortgage with the knowledge and consent of the lender. Knowledge on the part of the lender may be implied from the circumstances surrounding the case. *Freedman v. Katz, supra.* Roland A. Benge & Co. had an ongoing relationship with Salem Mortgage, Salem placing 50 to 60 percent of its loans with Benge. Testimony indicated that no compensation was paid by Benge to Salem Mortgage for its services. Where a lender accepts a customer from a broker without compensating the broker for its services, the lender must be presumed to know that the broker is obtaining compensation from the borrower, and is chargeable with notice of the broker's actions, and impliedly deemed to have authorized them. *Freedman v. Katz, supra,* 246 Mich. at 299, 224 N.W. 325; 47 C.J.S., Interest & Usury § 160, p. 286. It is inconceivable that Benge thought Salem Mortgage Company was placing loans on a gratuitous basis.

In sum, the court finds that Salem Mortgage Company was the agent of Roland A.

Benge & Co. and that the latter had knowledge of the broker's fee charged by Salem Mortgage in this transaction.

The broker's fee charged by Salem must be deemed interest and added to the stated rate of interest in the contract. If the rate of return when so combined exceeds the legal rate of interest chargeable in Michigan, then the transaction is usurious.

 The maximum legal rate of interest in the present transaction is 25%, the criminal usury rate provided for in M.C.L.A. § 438.31. Since Roland A. Benge & Co., is mortgage lender approved by the Federal Housing Administration, it is entitled to charge any rate of interest up to the 25% criminal usury rate. M.C.L.A. § 438.31c(2) and (5); Op.Atty.Gen.1980, No. 5765, p. 942. We thus conclude that even when the broker's fee charged by Salem Mortgage is included in the finance charge and annual percentage rate disclosed by Benge & Co., the effective rate of interest does not exceed the bounds allowed by Michigan statute.

In this Court's opinion, this is a tragic result in the present case. Here we have an unknowledgeable borrower who was confused and deceived by the actions and methods employed by the broker and lender; adding to the stated rate of interest the finder's fee brings the rate of interest to the hapless debtor to an unconscionable 22%, not the 11% the debtor bargained for. Perhaps the usury act, to be fully protective, should be amended to provide that any interest sought to be charged in excess of the rate contracted for would be usurious. This would allow the lender in the present case to be more adequately dealt with.

(F) *Violations of the Truth in Lending Act and Regulation Z*

Debtor has alleged that third-party defendant Roland A. Benge & Co., is in the business of regularly extending consumer credit, and that through its use of consumer credit cost disclosure statements, has violated the Truth in Lending Act.

Specifically, debtor alleges that Benge, the mortgage lender, failed to disclose the broker's fee charged by Salem Mortgage, which fee it was bound to disclose, and that the failure to disclose lead to or caused numerous other violations of the Truth in Lending Act. For purposes of clarity, the various allegations can be broken down into the following subcategories, as set forth by the Administrative Law Judge in *Security Industrial Loan Association,* FTC Docket No. 9006, CCH Consumer Credit Guide, ¶ 98,445 (1976), a case essentially on all fours with the present matter:

(1) Failing to include the broker's fee or finder's fee in the determination of the finance charge, as required by Sections 226.4(a)(3) and 226.6(d) of Regulation Z.

(2) Failing to disclose the broker's fee or finder's fee as a prepaid finance charge, as required by Section 226.8(e)(1) of Regulation Z.

(3) Failing to itemize the components of the finance charge, as required by Section 226.8(d)(3) of Regulation Z.

(4) Failing to disclose accurately the annual percentage rate computed in accordance with Section 226.5(b) of Regulation Z, as required by Section 226.8(b)(2) of Regulation Z.

It is the view of the court that the issues raised are more amenable to logical resolution when stated in the foregoing manner. We additionally find the decision of the learned Administrative Judge in *Security Industrial Loan Assoc., supra,* to be a compelling interpretation of the Truth in Lending Act and Regulation Z, fully in conformance with the intent of the drafters of the statute and its corresponding regulations. With this in mind, and based upon considerations of economy and clarity, the reader is referred to the above-cited decision for a detailed analysis of the law supporting the determinations which follow, and we hereby adopt the judge's decision in that case as it relates to, and is consistent with the immediate opinion.

(1) *Failure to Include the Broker's Fee in the Determination of the Finance Charge*

■ As a matter of law, Salem is a broker who obtains loans for its clients from lenders, an arranger for the extension of consumer credit, and is therefore a creditor under Regulation Z, as is Roland A. Benge & Co., which extends consumer credit. Reg. Z, Sections 226.2(f) and 226.2(m).

Because Regulation Z, Section 226.4(a)(3), defines the broker's fee as a finance charge, Regulation Z, Section 226.6(d) imposes an obligation upon the lender to disclose the fee in his Truth in Lending statements. Section 226.6(d) states:

> If there is more than one creditor in a transaction, each creditor shall be clearly identified and shall be responsible for making only those disclosures required by this Part which are within his knowledge and the purview of his relationship with the customer.

We hold that the broker's fee charged by Salem Mortgage in this transaction was within the knowledge of Roland A. Benge & Co., based upon the finding that Salem acted as the agent of Benge & Co., and is chargeable with knowledge of the fee. We further base this holding upon the finding that Benge & Co. had implied knowledge of the charges because it paid no compensation to the broker itself, due to its close business relationship with Salem, Benge & Co. was clearly on notice that Salem was not performing its brokerage service without renumeration.

> The overriding purpose of the Truth in Lending Act is full disclosure and in carrying out that purpose, the word "knowledge" should be given as expansive a construction as possible consistent with fairness.

*Security Industrial Loan Assoc., supra,* at p. 87,889.

We find that knowledge of the broker's fee is also within the purview of the relationship between Benge and its borrower because the fee is a proper element of the finance charge and a direct cost in incurring credit to the borrower.

> . . . knowledge of the broker's fee can be viewed as being within the purview of the relationship between [the lender] and

its customers because "any interpretation of Section 226.6(d) must take into account the manifest purpose of the law to ensure full disclosure of credit terms in situations involving brokered loans. . . .

*Security Industrial Loan Assoc., supra,* p. 87,889, citing *Virginia Mortgage Exchange,* FTC Docket No. 9007, CCH Consumer Credit Guide ¶ 98,545 (Initial Decision, August 18, 1975).

■ In sum, the broker violated Sections 226.4(a)(3) and 226.6(d) of Regulation Z by failing to include the broker's fee charged by Salem as a part of the finance charge on its disclosure statement. This holds true irrespective of the fact that dual disclosure was made in this case, with the fee being disclosed by Salem on its disclosure statement. Fed. Res. Bd. Official Staff Interpretation, FC–0050, 42 Fed. Reg. 14859 (1977).

(2) *Failure to Disclose the Broker's Fee as a Prepaid Finance Charge*

Section 226.8(3)(1) of Regulation Z requires the disclosure of

> Any finance charge paid separately, in cash or otherwise, directly or indirectly to the creditor or with the creditor's knowledge to another person, or withheld by the creditor from the proceeds of the credit extended.

According to Section 226.8(d)(2), the charges must be disclosed as a prepaid finance charge".

\* \* \* \* \* \*

[The] discussions of the "knowledge" and "purview" requirements of Section 226.6(d) in part [1], *supra,* is applicable here. Since the broker's fee is within the knowledge of [the lender] and the purview of its relationship with its customers, the fee must be disclosed on its Truth in Lending statements as a prepaid finance charge.

*Security Industrial Loan Assoc., supra,* at p. 87,889.

We adopt the foregoing quotation as the holding of this court in the present matter, and further hold that the failure of Benge & Co. to make the disclosure was a violation of Regulation Z, Section 226.8(e)(1).

**(3)** *Failure to Itemize the Components of the Finance Charges*

Section 226.8(d)(3) requires the disclosure of the total amount of finance charge, with a description of each amount included, using the term "finance charge," to the extent the individual amounts are required to be disclosed by Section 226.6(d). As outlined in section (1) above, the latter section requires disclosure of broker's fees. Thus, for the same reasons which required disclosure in sections (1) and (2) above—the "knowledge and purview" test—we hold that Benge & Co. violated the duty imposed upon it by Regulation Z to fully itemize the components of the finance charge by including the amount charged for broker's fees.

**(4)** *Failure to Disclose Accurately the Annual Percentage Rate*

The court in *Security Industrial Loan Assoc., supra,* formulates the requirement that the Annual Percentage Rate (APR) be accurately disclosed as follows:

> Section 226.8(b)(2) of Regulation Z requires with exceptions not applicable here, the disclosure of the creditor's finance charge expressed as an annual percentage rate using that term. Sections 226.5(b)(1) and (2) require disclosure of the APR with an accuracy at least to the nearest quarter of 1 percent and if [the lender] must include the broker's fee as a component of the finance charge, the difference between the true APR and that actually disclosed by [the lender] would exceed the tolerance level established by Sections 226.5(b)(1) and (2).

*Security Industrial Loan Assoc., supra,* at p. 87,888.

In the present case, we find that Benge & Co. failed to include the broker's fee as a component in computing its APR, and the APR which is disclosed is therefore less than if the broker's fee were included.

> Since the multiple creditor provision of Regulation Z (Subsection 226.6(d)) controls the disclosures required by Section 226.8(b)(2), [the lender] has failed to disclose accurately the APR because the broker's fee is within the knowledge and purview of its relationship with its customers.

*Security Industrial Loan Assoc., supra,* at p. 87,889.

For this reason we hold that Benge & Co. violated its duty to accurately disclose the annual percentage rate in this transaction, as required by the Truth in Lending Act and Regulation Z.

## V

### Relief and Order

We now hold that Salem Mortgage Company and Roland A. Benge & Company have violated the provisions of the Michigan Consumer Protection Act, M.C.L.A. §§ 445.-901 *et seq.,* as set forth in detail in section (D), *supra.* By exacting a brokerage fee from Mr. Dukes, when its efforts in finding a willing lender were illusory, and it was in fact acting as the agent for, and in concert with Benge & Co., Salem caused Dukes actual damages in the amount of $760.00; the difference between reasonable closing fees for the transaction ($370.00), and the net amount of the broker's fee charged ($1,130.00). When Mr. Dukes dealt with Salem Mortgage, he was actually dealing with Roland A. Benge & Company. Because the brokerage was an illusion, so, too, is the rightful compensation therefor.

This amount shall be returned to Mr. Dukes by Salem, and reasonable attorney's fees are to be paid Mr. Dukes for the efforts of his legal counsel in this litigation. M.C.L.A. § 445.911(2).

In addition, Roland A. Benge & Co. is ordered to pay Dukes his reasonable attorney's fees and the amount of $1,000.00, for its violation of the Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.,* as more fully set forth in section (F) of this opinion, which shall be credited to the present principal amount due. 15 U.S.C. § 1640(a)(2)(A)(i).

Additionally, Benge shall be limited to an annual rate of 11% on the principal balance of the mortgage.

IT IS SO ORDERED.