**In re Cora RUSSELL, Debtor.**

**Cora RUSSELL, Plaintiff,**

v.

**FIDELITY CONSUMER DISCOUNT COMPANY, Defendant.**

**Bankruptcy No. 86–00995K.
Adv. No. 86–0712K.**

United States Bankruptcy Court,
E.D. Pennsylvania.

April 23, 1987.

Gary Klein, Philadelphia, Pa., for debtor.

Lawrence T. Phelan, Philadelphia, Pa., for Fidelity Consumer Discount Co.

James J. O'Connell, Philadelphia, Pa., Standing Chapter 13 Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

## A. INTRODUCTION AND PROCEDURAL HISTORY

The instant adversarial proceeding presents to us a number of questions which are both provocative and are apparently of first impression, at least in this jurisdiction. The issues presented, and our decisions as to each of them, are as follows:

1. Is a consumer who has alleged material violations of the federal Truth-in-Lending Act, 15 U.S.C. § 1601, et seq. (hereinafter referred to as "TILA"), entitled to recover actual damages without having to show his or her "detrimental reliance" on an errant disclosure statement; and, if so, how are those damages to be computed? We hold that the proof by the consumer here that the lender materially understated the applicable finance charge entitles the consumer to actual damages measured by the amount of the undisclosed finance charges, without requiring the consumer to further prove her "detrimental reliance" on the disclosure statement.

2. Is a loan in which the finance charge exceeds the maximum allowed under state law insulated from a claim of usury by federal pre-emptive legislation where the lender fails to establish on the factual record that the conditions for federal pre-emption exist; and, if usury is found, how are the damages computed under pertinent Pennsylvania law? We hold that the lender has a strict burden of proof if it desires to establish federal pre-emption of state usury laws, and, since the lender here failed to meet this burden, we must find the loan usurious. However, we will measure the "excess interest paid" by the difference between the interest charged and the lawful rate under the state loan act with which we believe that the lender should have complied, instead of the "legal rate of interest" in this state, especially since the consumer is entitled to treble damages.

3. Does the Pennsylvania "unfair or deceptive acts and practices" (hereinafter referred to as "UDAP") statute extend to alleged unfair trade practices by lenders? We find that the remedial nature of the Pennsylvania UDAP statute supports its application to loan transactions.

4. Does the federal Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, et seq. (hereinafter referred to as "RESPA"), apply to non-purchase-money loans? We hold that it does not.

On February 28, 1986, CORA RUSSELL, the Debtor, filed the instant Chapter 13 bankruptcy case, and, on March 26, 1986, the Defendant, FIDELITY CONSUMER DISCOUNT COMPANY, filed an itemized Proof of Claim alleging a debt, secured by a mortgage, totalling $14,709.29 owed to it by the Debtor. Included among the items claimed, as abridged by us, for the purposes of clarity, were the following:

| | |
|---|---|
| Principal Balance | $ 5,639.39 |
| Interest and Late Charges 7/24/85 to 2/28/86 | 1,220.52 |
| Fees and Costs, mostly arising from a state court foreclosure action | 2,174.85 |
| Interest "at contract rate for 60–month term of plan" | 5,674.53 |
| TOTAL | $14,709.29 |

This Proof of Claim elicited, from the Debtor, on July 16, 1986, a response in the form of an eight-count "Complaint Objecting to Secured Claim and Seeking Damages." On August 15, 1986, the Defendant filed an Answer denying virtually all of the allegations of the Complaint and asserting several "affirmative defenses." On February 28, 1987, subsequent to the trial, we granted an unopposed Motion permitting the Debtor to add claims under the Pennsylvania UDAP and RESPA, placing before us at this time a ten-count Complaint.

The matter initially was listed for trial on November 13, 1986. At that time, the Defendant conceded a TILA statutory liability of $1,000.00 pursuant to 15 U.S.C. § 1640(a)(2)(A)(i) and also allowed that, since service in the state court foreclosure proceeding had been defective, the fees and costs would be reduced from $2,174.85 to $352.35. In addition, the assertions set forth in the Debtor's unanswered requests for admissions, which consisted of a number of documents relevant to the parties' loan transaction of December 8, 1982, were admitted into the record.

In order to presumably resolve certain remaining factual issues, the Debtor took the witness stand, with the understanding that the Defendant could produce responsive testimony at a subsequent hearing. At the close of the testimony, by agreement of Counsel, the Court issued an Order directing Counsel to produce a further Stipulation of Facts on or before December 1, 1986; scheduling the supplemental hearing, if necessary, on December 2, 1986; and requesting the parties to file their Briefs on the merits on or before January 5, 1987, and February 5, 1987, respectively.

The December 2, 1986, hearing date was rescheduled, being finally conducted, per an Order of December 17, 1986, on January 7, 1987. On that date, a further Stipulated Statement of the Case was submitted, confining the issues to TILA actual damages, usury, inclusion of unearned interest in the Proof of Claim, and the legality of the application of certain proceeds of the loan. The date for submissions of Briefs by the parties was set back until February 6, 1987, and March 5, 1987, respectively.

On January 7, 1987, the Defendant again declined our invitation to present testimony. However, the Debtor testified once again, about another aspect of the transaction, and the Debtor also called one Edward Pressman as an additional brief witness. In all, the complete record of testimony in this case, which elicited this Opinion of fifty typewritten pages, consisted of less than thirty-five pages.

After the completion of the ordered briefing, the Debtor favored us with a Reply Brief on March 20, 1987.

Although most of the facts are not in dispute, we are nevertheless proceeding to make several specific Findings of Fact, which we shall follow with specific Conclusions of Law and a rather extended Discussion, rendered necessary because of the first-impression status of many of the issues raised.

## B. FINDINGS OF FACT

1. The Debtor, apparently a single, middle-aged woman, resides in a property owned by her sister at 2713 North Judson Street, Philadelphia, Pennsylvania, but owns realty located at 6060 Vine Street, Philadelphia, Pennsylvania 19139, which was, at the time of the hearings, vacant.

2. In late 1982, the Debtor was confronted with several delinquent bills, including taxes and water and sewer charges, mostly relative to her Vine Street realty, and she consulted the telephone directory to attempt to find a company to make a loan to her to pay these bills.

3. The Debtor is a totally honest and sincere individual, whose testimony we fully credit. However, we also believe her to be totally unsophisticated in financial affairs and her ability to recall and comprehend the details of her loan transaction were limited. Her principal occupation appears to have been the operation of a laundromat in West Philadelphia.

4. The Debtor testified that she called several lending institutions before coming into the office of the Defendant in Upper

Darby and filling out an application for the loan in issue.

5. The Debtor had no recollection of the involvement of any mortgage brokers in the loan transaction, nor did she agree that any proceeds of her loan would be distributed to any such parties. She stated that she had never heard of Suburban Financial Services or City and Suburban Land Development Company, and was totally unaware of any role that these companies played in this transaction.

6. After her initial visit to the Defendant's office to make a written application, an agent from the Defendant came to the Debtor's laundromat, asked her several additional questions, and arranged for the Debtor to come to the Defendant's office to sign the final loan papers.

7. When the Debtor arrived at Fidelity's office on the second occasion, which was on December 8, 1982, all of the papers were completely prepared and ready for her signature.

8. The Debtor, being an unsophisticated borrower who was obtaining a loan from which the proceeds would be distributed to other creditors, did not know precisely how much she was actually borrowing and what was in fact set forth in the papers that she signed.

9. The Debtor did note that the papers indicated that the her loan was for the amount of $7,000.00, and she therefore initially assumed that $7,000.00 was to be distributed to her creditors. She did state, however, that, at some point during the execution of the papers on December 8, 1982, she realized that deductions had been made from the $7,000.00 in the distribution to her creditors, which she protested. However, she also ultimately signed the papers, apparently without asking and certainly without understanding the nature of these deductions.

10. While the Debtor testified that she would not have made the loan if she had known about the deductions beforehand, she also testified that she needed the money badly and hence the implication arises that she would have agreed to almost any terms, even at interest rates which were very high, to get the money needed.

11. The Debtor was presented with a Federal Truth-in-Lending Disclosure and Insurance Statement (hereinafter referred to as "the TILA Statement") in the transaction. The TILA Statement included, *inter alia*, the following information:

| | |
|---|---|
| Amount Financed (at top) | $7,000.00 |
| An "Itemization of Amount Financed" (a little further down) as follows: | . |
| Amount given to me directly | $1,508.98 |
| Amount paid to others on my behalf | $5,491.02 |
| Total of above items | $7,000.00 |
| Prepaid Finance Charge (origination fee) | $1,190.00 |
| Amount Financed (at bottom) | $5,810.00 |
| Finance Charge | $5,082.80 |
| Annual Percentage Rate | 33.70% |
| Total of Payments: 59 payments of $202.00 and a final payment of $164.00 | |

12. The Debtor was also given a "schedule of disbursements," which stated, *inter alia*, as follows:

| | |
|---|---|
| Amount of Mortgage Loan | $7,000.00 |
| Service Charge (Origination Fee) | $1,190.00 |
| Total Deductions (including insurance and other closing costs in addition to the above) | $1,498.81 |
| Net Proceeds of Mortgage Loan | $5,501.18 |
| Checks drawn (seven checks itemized, all to creditors except checks in the amount of $300.00 and $18.98 to the Debtor) | |
| Total Checks | $5,501.18 |

13. When asked about the $300.00 check which was given to her in the transaction at the second hearing, the Debtor testified that she was told to endorse the check in order that it could be remitted to "the individual that approved the loan," and she did so.

14. Edward Pressman, the President of Suburban Financial Services, testified and identified himself as a "mortgage broker." He stated that he had no specific recollection of the December 8, 1982, transaction but did acknowledge that, on December 15, 1982, his company received two checks totalling $370.00 from the Defendant relative to this transaction. The Defendant stipu-

lated that it directly paid a commission of $70.00 to Suburban Financial Services, Inc. and that the check in the amount of $300.00 from the loan proceeds was endorsed by the Debtor and "City and Suburban Land Development Corp. t/a Suburban Financial Services."

15. A payment of $201.66 was made by the Defendant to the City of Philadelphia on account of a water and sewer bill on the 6060 Vine Street property on December 14, 1982. Other payments were made on account of real estate taxes on this premises.

16. As security for the loan, the Defendant took a mortgage on the Debtor's realty at 6060 Vine Street in the face amount of $7,000.00. The Debtor had no other mortgage on the premises. Therefore, after the payment of the bills for taxes and water and sewer rents on the premises from the loan proceeds, the Defendant held a first mortgage and first lien on the premises.

17. The parties agreed that the Debtor paid a total of $5,118.00 to the Defendant between December 8, 1982, and February 28, 1986, the date of her bankruptcy filing.

18. While we are unable to ascertain how the Defendant computed a "Principal Balance" of $5,639.39, at the time of the Debtor's filing, as set forth in its Proof of Claim described at page 857 *supra*, this sum is in excess of the principal sum actually loaned to the Debtor in the transaction in issue, which was $7,000.00 less the sum of the $1,190.00 "origination fee" and the $300.00 "broker's commission," which left a net remaining principal balance of $5,510.00. Therefore, all of the payments made by the Debtor apparently were considered by the Defendant to have been interest payments.

19. The Defendant presented no evidence whatsoever, neither indicating under what laws it is allegedly licensed nor anything relevant to the business which it performs, and the pleadings do not establish any relevant facts in its favor. We take judicial notice of the fact, pursuant to Federal Rules of Evidence (hereinafter referred to as "F.R.Ev.") 201(b), that the Defendant is licensed under the Pennsylvania Consumer Discount Company Act, 7 P.S. § 6201, et seq. (hereinafter referred to as "CDCA"). We are, however, unable to take judicial notice of the Defendant's assertion, even though supported by an "Affidavit" of its President, Jerry H. Silver, attached as an Exhibit to the Defendant's post-trial Brief, that it "makes or invests in real property loans that aggregate more than $1,000,000.00 per year," as this is not a fact "generally known" in this jurisdiction, per F.R.Ev. 201(b).

20. We also take judicial notice of the fact that, had the Defendant written a loan in which the Debtor received proceeds of $5,510.00 over the approximately 39–month period from December 8, 1982, to February 28, 1986, under the CDCA, the maximum finance charge which it could have collected would have been no more than $2,288.05.

## C. CONCLUSIONS OF LAW

1. The Defendant committed substantial, as opposed to technical, violations of the TILA in the making of disclosures on its TILA Statement, resulting in an understatement of the finance charges imposed upon the Debtor by $1,490.00. The imposition of undisclosed finance charges is "actual damage" sustained by the Debtor, recoverable under 15 U.S.C. § 1640(a)(1) in addition to statutory damages of $1,000.00 pursuant to 15 U.S.C. § 1640(a)(2)(A)(i), and the Debtor is therefore entitled to recover damages of $1,490.00 pursuant to 15 U.S.C. § 1640(a)(1).

2. The Defendant has failed to meet its strict burden of proving that the loan in issue is within the scope of transactions exempted from state usury laws by the pertinent federal pre-emptive legislation, Title V of the federal Depository Institution Deregulation and Monetary Control Act (hereinafter referred to as "DIDMCA").

3. Therefore, any finance charges imposed by the Defendant upon the Debtor in excess of those otherwise allowable under state law are usurious.

4. Since the Defendant had collected interest in the amount of $5,118.00 from the Defendant, a sum $2,829.95 in excess of the $2,288.05 which would have been the highest permissible finance charges which the Defendant could have imposed under state law against the Debtor in the pertinent time-period prior to the bankruptcy filing, the Debtor is entitled to damages of three times the excessive interest paid, or $8,489.55, pursuant to 41 P.S. § 502.

5. The Pennsylvania UDAP applies to consumer loan transactions. Therefore, the only violation of UDAP alleged here, the collection of an undisclosed $300.00 "brokerage commission" from the Debtor, was an unfair trade practice within the scope of UDAP, entitling the Debtor to treble damages, or $900.00, per 73 P.S. § 201-9.2.

6. RESPA applies only to purchase-money loan transactions, per 24 C.F.R. § 3500.5(d)(2). Therefore, this transaction is not within the scope of RESPA, and the Debtor is not entitled to any damages on this claim.

7. The Debtor's payments plus the sums of damages to which she is entitled exceed the sum of the amounts to which the Defendant is entitled by an amount of $8,538.33. Therefore, the Debtor is entitled to a judgment in the amount of this excess sum against the Defendant, which must be remitted to the Trustee by the Defendant.

## D. DISCUSSION

### 1. TILA ACTUAL DAMAGES

The federal TILA, originally enacted in 1969 to attempt to resolve the problem arising in the burgeoning post-World War II consumer-credit industry of over-reaching of consumers by certain creditors by means of imposing unknown and often unknowable finance charges upon consumers, *see Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 363–69, 93 S.Ct. 1652, 1657–60, 36 L.Ed.2d 318 (1973), has been a Congressional "success story." The problem addressed by the Act was that, due to their leverage arising from production of adhesion contracts, the credit indus-try was imposing charges upon consumers of which consumers were ignorant. *Mourning, supra,* 411 U.S. at 363–65, 93 S.Ct. at 1657–58. The theory of the TILA was that, by requiring creditors to inform consumers, in standardized disclosure terms, of the cost of credit, consumers would be enlightened about these terms and would be able to shop for credit. The philosophy of "Let the buyer beware" was, thus, per former Chief Justice Burger, transformed into the philosophy of "Let the seller [or lender] disclose." *Mourning, supra,* 411 U.S. at 377, 93 S.Ct. at 1664.

We should note, however, that the TILA was necessarily limited in its role as a protective device against all species of sharp business practices of creditors. All that it required was disclosure of whatever the terms in a consumer credit transaction in fact were. It did not limit what those terms could be. That is to say, the TILA required creditors to disclose such terms as the "finance charge" and the "annual percentage rate," in standardized fashion. However, it did not set any bounds as to what such "finance charges" and "annual percentage rates" could be. For the most part, this was left to the states, by means of their own individualized and traditional consumer protection legislation, i.e., usury laws, laws licensing lenders and credit sales, and UDAP legislation.

However, the efficacy of the TILA to operate in tandem with those state laws cannot be underestimated. Many provisions of the TILA—as examples, the four-installment rule considered in *Mourning* and the concept that insurance which the lender required the consumer to purchase was in fact a finance charge—were aimed at preventing creditors from circumventing the basic principles established in the applicable state laws in making disclosures. As Congress recognized, certain creditors, by the use of clever adhesion-contract provisions, were quite capable of such circumvention and quite anxious to make creative attempts at doing so. *See Mourning,* 411 U.S. at 365–66, 93 S.Ct. at 1658–59.

In retrospect, the TILA has been a tremendous success. It is submitted that this has been due, in large part, to these sections of the TILA which provide automatic monetary awards to consumers for virtually any violations of its terms. Congress wisely chose to impose a modest automatic statutory penalty upon the creditor who violated the TILA, 15 U.S.C. § 1640(a)(2)(A)(i), i.e., twice the finance charge, but not less than $100.00 nor more than $1,000.00 per transaction. Perhaps even more wisely, Congress also chose to reward successful consumers' counsel in TILA actions with reasonable attorneys fees. 15 U.S.C. § 1640(a)(3). These provisions encouraged consumers, and perhaps more significantly, their creative lawyers, to take an offensive to scrutinize TILA disclosure statements, ferret out violations, and then take creditors to court for statutory damages plus attorneys fees. Thus, an almost archetypal "private attorney general" enforcement system was established, ultimately in the person of attorneys who carefully read these disclosure statements and took delight in the "man bites dog" aspect of suing creditors for TILA violations.

This development served the necessary purpose of balancing the creative circumvention powers of creditors, and it was furthered by cases which have consistently held that any TILA violations, no matter how technical, are actionable and gave rise to statutory damages. *See, e.g., Thomka v. A.Z. Chevrolet, Inc.*, 619 F.2d 246, 250 (3d Cir.1980); and *Gennuso v. Commercial Bank & Trust Co.*, 566 F.2d 437, 440–41 (3d Cir.1977). The TILA caselaw has also consistently held that the consumer need not prove actual damages to prevail; rather, it was assumed that, in most cases, actual damages were perhaps non-existent and were, in any event, almost impossible to prove. *See Dzadovsky v. Lyons Ford Sales*, 593 F.2d 538, 539 (3d Cir.1979). Thus, the typical TILA case involved merely an inspection of a disclosure statement, and a determination as to whether the statement violated any of the TILA provisions. If a violation of any sort could be established, an award of statutory damages and reasonable attorneys' fees followed.

In 1980, Congress, as part of the comprehensive DIDMCA, softened the bite of the TILA somewhat by enactment of the Truth-in-Lending Simplification and Reform Act, P.L. No. 96–221, Title VI (1980). At that point, Congress became convinced that one consequence of the TILA was a large volume of lawsuits based upon hypertechnicalities which no longer worked in the best interests of our society. Whether this development was wise is open to question, since the competing consideration of creditor overreaching had certainly not dampened entirely. However, it is true that, in the previous decade, the volume of TILA legislation had brought about considerable creditor compliance. In any event, the Simplification Act did not completely do away with the prophylactic aspects of the TILA, and the TILA remains as one of the most important weapons to discourage overreaching by creditors.

In 1974, prior to the more sweeping changes enacted in 1980, Congress made two basic changes in the damage provisions of 15 U.S.C. § 1640. First, it added 15 U.S.C. § 1640(a)(2)(B), limiting the total recovery in a TILA class action in response to legitimate creditor concern that a widespread technical TILA defect in standardized forms could result in a financially devastating class-action liability, to the lesser of $500,000.00 or one percent of the creditor's net worth. However, apparently as a logical trade-off to the imposition of the concept that technical violations should not prove financially devastating to creditors, was the introduction of the concept that, if the consumer could show actual damages as a result of a TILA violation, then those damages should be recovered in full, in addition to the modest statutory penalty. In other words, while Congress was limiting the financial impact of purely technical violations upon creditors, it was, at the same time, imposing greater potential penalties against serious TILA violations, i.e., transactions in which TILA violations were substantial and actually resulted in a consumer's having been misled about the cost

of credit. Thus, we have 15 U.S.C. § 1640(a)(1), which reads as follows:

(a) Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part, including any requirement under section 1635 of this title, or part D or E of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—

(1) any actual damage sustained by such person as a result of the failure;
...

■ The paucity of citations in the Briefs of both parties and our inability to locate much additional authority indicates that 15 U.S.C. § 1640(a)(1) has not been frequently invoked by consumers. This factor indicates that cases in which consumers allege actual damages are rare, and that, in most cases, there is a concession on the part of the consumer that no actual damage has resulted from the violation. However, given the foregoing analysis, in that limited class of cases where the consumer *does* allege actual damages, we can conceive of no reason for giving this section a narrow reading. We believe that actual damages arise whenever a disclosure statement contains a substantial violation, as opposed to a mere technical violation, and that damages should be measured by the magnitude of the violation.

■ We acknowledge that some cases have given this statutory provision a narrow reading. In *Adiel v. Chase Federal Savings & Loan*, 630 F.Supp. 131 (S.D.Fla. 1986); and *McCoy v. Salem Mortgage Co.*, 74 F.R.D. 8 (E.D.Mich.1976), the courts held that a consumer must prove "detrimental reliance," i.e., that he or she would have gotten credit on more favorable terms but for the violation, to be entitled to a recovery based on 15 U.S.C. § 1640(a)(1).

There are several reasons why we believe that such a narrow reading of § 1640(a)(1) is in error. First, the entire TILA statute is remedial, disclosure legislation. In analogous federal Securities Exchange Act and Anti-Trust Act disclosure-violation cases, the Supreme Court has re-peatedly held that actual damages arise upon the plaintiff's proof that a material disclosure mis-statement has been made, irrespective of whether the mis-statement actually resulted in conduct in reliance of it. *See Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 384–85, 90 S.Ct. 616, 621–22, 24 L.Ed.2d 593 (1970); and *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931).

Secondly, a 1980 amendment to the TILA codified in 15 U.S.C. § 1640(b) as follows, suggests the result that the consumer should be awarded, as actual damages, a reduction of undisclosed finance charges:

(b) A creditor or assignee has no liability under this section or section 108 or section 112 for any failure to comply with any requirement imposed under this chapter or chapter 5, if within sixty days after discovering an error, whether pursuant to a final written examination report or notice issued under section 108(e)(1) or through the creditor's or assignee's own procedures, and prior to the institution of an action under this section or the receipt of written notice of the error from the obligor, the creditor or assignee notifies the person concerned of the error and *makes whatever adjustments in the appropriate account are necessary to assure that the person will not be required to pay an amount in excess of the charge actually disclosed, or the dollar equivalent of the annual percentage rate actually disclosed, whichever is lower.* (emphasis added).

This statutory section provides, in effect, that a creditor can escape TILA liability by correcting an error in the disclosure statement. However, upon doing so, the creditor must also make whatever adjustments are necessary in the transaction "to assure that the person will not be required to pay an amount in excess of the charge actually disclosed." Only if the creditor faces the possibility that an understated finance charge will not be imposed on the consumer in any event is there any incentive placed upon the creditor to take the correc-

tive action envisioned by 15 U.S.C. § 1640(b).

Finally, there is language in several TILA class actions which suggest that it is unrealistic and unnecessary for consumers alleging actual damages per 15 U.S.C. § 1640(a)(1) to prove "detrimental reliance." In *Ransom v. S & S Food Center of Florida*, 700 F.2d 670, 677 (11th Cir. 1983), the court affirms, although without analysis or comment, the trial court's allowance of damages, under § 1640(a)(1), of "the additional finance charge paid by each class member which exceeded the legally permissible finance charge." In *Eovaldi v. First National Bank of Chicago*, 71 F.R.D. 334, 336 (N.D.Ill.1976), the court holds that "specific proof" of actual damages is unnecessary. In *Goldman v. First National Bank of Chicago*, 532 F.2d 10, 15 (7th Cir.1976), the court strongly suggests that "actual damages" should be measured by the amount of undisclosed finance charges.

■ In the instant factual setting, it is apparent that the Defendant failed to include either the $1,190.00 "origination fee" or the $300.00 "commission" paid to Suburban Financial Services in the finance charge set forth in the Debtor's TILA Statement. It is difficult to imagine a more blatant and fundamental violation of the TILA, or one more far removed from the technical and practically innocuous TILA violations that this Court has determined entitle the consumer to only statutory damages in such cases as *In re Johnson-Allen*, 67 B.R. 968 (Bankr.E.D.Pa. 1986).

The Defendant, in its defense, has not denied any of the material facts set forth herein nor did it offer any alternative analysis of § 1640(a)(1) in its Brief. Rather, it merely quoted from those portions of the transcript in which the Debtor conceded that, at some point, she noticed that the $1,190.00 "origination fee" had been deducted from the net proceeds received by her, and that she needed the money badly and ultimately went through with the transaction anyway.

Putting aside the fact that the $300.00 "commission" paid to Suburban Financial Services was so well concealed that even the Debtor's astute counsel, not to mention the unsophisticated Debtor herself, apparently did not discover it until after the November 13, 1986, hearing, we cannot agree that the Debtor's above testimony should insulate the Defendant from any portion of the $1,490.00 alleged liability for actual damages. The TILA Statement, taken as a whole, falsely indicated that the "origination fee" was not a "finance charge." While the Debtor may have realized that the $1,190.00 of the loan proceeds was not going to her, we have no doubt that she had no conception of where it actually was going, or why this charge was imposed. Furthermore, the Defendant never did explain, in this record, any basis for this charge. We will not hold that a creditor's imposition of unexplained, inscrutable, and improperly disclosed charges upon an unsophisticated consumer is justified simply because, at some point in the transaction, the consumer has a faint glimmer of realization that the charges are made and/or the consumer is susceptible and desperate enough to pay the charges even if they are totally unjustified.

We therefore hold that, having totally failed to disclose $1,490.00 of what were clearly "finance charges" as such on the Debtor's TILA Statement, the Defendant is liable to the Debtor for actual damages of $1,490.00 per 15 U.S.C. § 1640(a)(1), in addition to $1,000.00 statutory damages pursuant to 15 U.S.S. § 1640(a)(2)(A)(i).

### 2. USURY

The Debtor raises an equally interesting and novel claim that the loan in issue is usurious, and the potential damages flowing to her as a result of this claim are more substantial than those arising from any of the other claims.

The beginning and end of the analysis of this claim are those sections of Act No. 6 of 1974, 41 P.S. §§ 501–07, the Pennsylvania state law defining and allowing damages for usury. The key section is 41 P.S. § 502, which provides as follows:

§ 502. Usury and excess charges recoverable

A person who has paid a rate of interest for the loan or use of money at a rate in excess of that provided for by this act or otherwise by law or has paid charges prohibited or in excess of those allowed by this act or otherwise by law may recover triple the amount of such excess interest or charges in a suit at law against the person who has collected such excess interest or charges: Provided, That no action to recover such excess shall be sustained in any court of this Commonwealth unless the same shall have been commenced within four years from and after the time of such payment. Recovery of triple the amount of such excess interest or charges, but not the actual amount of such excess interest or charges shall be limited to a four-year period of the contract.

We should note at the outset that the approach of the Pennsylvania legislature towards usury differs from that of some jurisdictions. Pennsylvania law does not render the entire transaction void, nor provide any of the other drastic sort of penalties that some other jurisdictions impose in a case of usury, i.e., that the lender in a usurious transaction must forfeit the principal amount borrowed or at least all of the finance charges imposed if the transaction is found usurious. *See generally* 45 AM. JUR.2d, Interest & Usury, § 238, at 181–82 (1969). Further, merely contracting with a consumer to obtain usurious interest does not, as in an even greater number of jurisdictions, result in the forfeiture of all interest contracted for in the transaction. *Id.* Rather, it is only when "excess interest" is "paid" by the borrower or "collected" by the lender that the treble-damage penalty of 41 P.S. § 502 is triggered.

This "tolerance" for usurious activity in Pennsylvania probably accounts for the small number of cases which have been maintained under 41 P.S. § 502. It is only in the rather unusual situation where the borrower not only contracts to pay, but actually has paid, usurious interest that a claim arises. Given this tolerance allowed to usurers, we are not inclined to otherwise interpret 41 P.S. § 502 narrowly in favor of usurers. Rather, it appears to us that, especially since it limits the imposition of damages as it does, this legislation must be construed to be remedial, like the TILA and the Pennsylvania UDAP, both of which we construe similarly elsewhere in the course of this Opinion.

The "legal rate of interest" in Pennsylvania is six (6%) percent. 41 P.S. § 201. However, this rate is only applicable as to transactions which are not permitted to be maintained at higher rates "otherwise by law." 41 P.S. § 502. Notable exceptions to the six (6%) percent rates are not only the mortgage transactions directly regulated by Act No. 6 itself, 41 P.S. § 301, but also consumer financing and loan transactions engaged in by licensees under various statutes allowing higher rates of interest.

The law permitting the highest rate of interest which may be legally charged under Pennsylvania law, subsequent to the repeal of the former Small Loan Act, 7 P.S. § 6151, et seq. (repealed), is the Pennsylvania Consumer Discount Company Act, 7 P.S. § 6201, et seq. (hereinafter referred to as "CDCA").

The Court performed its own calculations, and independently checked these conclusions with the Pennsylvania Department of Banking, as to what maximum "finance charges" and "annual percentage rate" could be imposed under the CDCA in a transaction in which the consumer would receive a net sum of $5,510.00, and the loan would extend for thirty-nine (39) months, approximately the period of time from when the loan in issue was made, on December 8, 1982, to the date of the Debtor's bankruptcy filing, February 28, 1986. Our conclusion was that the applicable portion of the CDCA was 7 P.S. § 6217.1, as refined by an interpretive Regulation of the Banking Commission upheld by the state courts in *Beneficial Consumer Discount Co. v. Whitesell,* 45 Pa.Cmwlth. 156, 404 A.2d 794 (1979). Pursuant to this Section of the CDCA, the maximum finance charge under the CDCA on a 39–month loan of a

principal amount of $5,510.00 would have been $2,288.05.[1]

In another portion of the same act in which Congress included the TILA Simplification and Reform Act, P.L. 96–221, Title V, Congress also passed a law pursuant to which, in certain circumstances, state usury laws were preempted. Although this is the name of the entire Act, we shall refer to this portion of the Act herein as the Depository Institution Deregulation and Monetary Control Act (hereinafter referred to as "DIDMCA"). Study of this Act is initially complicated by the fact that it is not codified as such in the United States Code (hereinafter referred to as "U.S.C."). Rather, it appears only in the "Historical Note" appearing in U.S.C. under 12 U.S.C. § 1735f–7.[2]

1. We take judicial notice of these calculations pursuant to F.R.Ev. 201(b), as we believe that this figure is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *See Transorient Navigators Co., S.A. v. M/S Southwind,* 788 F.2d 288, 293 (5th Cir.1986).

2. Because of the difficulty in finding the pertinent provisions of the DIDMCA in U.S.C., we herein reproduce, in its entirety, section (a)(1) of the Act, which contains most of the provisions relevant to this case and § 527(b) of the DIDMCA, codified at 12 U.S.C. § 1735f–5(b):

(a)(1) The provisions of the constitution or the laws of any state expressly limiting the rate or amount of interest, discount points, finance charges, or other charges which may be charged, taken, received, or reserved shall not apply to any loan, mortgage, credit sale, or advance which is—

"(A) secured by a first lien on residential real property, by a first lien on stock in a residential cooperative housing corporation where the loan, mortgage, or advance is used to finance the acquisition of such stock, or by a first lien on a residential manufactured home;

"(B) made after March 31, 1980; and

"(C) described in section 527(b) of the National Housing Act (12 U.S.C. 1735f–5(b) [section 1735f–5(b) of this title], except that for the purpose of this section—

"(i) the limitation described in section 527(b)(1) of such Act [section 1735f–5(b)(1) of this title] that the property must be designed principally for the occupancy of from one to four families shall not apply;

"(ii) the requirement contained in section 527(b)(1) of such Act [section 1735f–5(b)(1) of this title] that the loan be secured by residential real property shall not apply to a loan secured by stock in a residential cooperative housing corporation nor to a loan or credit sale secured by a first lien on a residential manufactured home;

"(iii) the term 'federally related mortgage loan' in section 527(b) of such Act [section 1735f–5(b) of this title] shall include a credit sale which is secured by a first lien on a residential manufactured home and which otherwise meets the definitional requirements of section 527(b) of such Act [section 1735f–

5(b) of this title], as those requirements are modified by this section;

"(iv) the term 'residential loans' in section 527(b)(2)(D) of such Act [section 1735f–5(b)(2)(D) of this title] shall also include loans or credit sales secured by a first lien on a residential manufactured home;

"(v) the requirement contained in section 527(b)(2)(D) of such Act [section 1735f–5(b)(2)(D) of this title] that a creditor make or invest in loans aggregating more than $1,000,000 per year shall not apply to a creditor selling residential manufactured homes financed by loans or credit sales secured by first liens on residential manufactured homes if the creditor has an arrangement to sell such loans or credit sales in whole or in part, or if such loans or credit sales are sold in whole or in part to a lender, institution, or creditor described in section 527(b) of such Act [section 1735f–5(b) of this title] or in this section or a creditor, as defined in section 103(f) of the Truth in Lending Act [section 1602(f) of title 15, Commerce and Trade], as such section was in effect on the day preceding the date of enactment of this title [Mar. 31, 1980], if such creditor makes or invests in residential real estate loans or loans or credit sales secured by first liens or residential manufactured homes aggregating more than $1,000,000 per year; and

"(vi) the term 'lender' in section 527(b)(2)(A) of such Act [section 1735f–5(b)(2)(A) of this title] shall also be deemed to include any lender approved by the Secretary of Housing and Urban Development for participation in any mortgage insurance program under the National Housing Act [this chapter]."

12 U.S.C. § 1735f–5(b) provides as follows:

(b) For purposes of subsection (a) of this section, the term "federally related mortgage loan" means any loan which—

(1) is secured by residential real property designed principally for the occupany of from one to four families; and

(2)(A) is made in whole or in part by any lender the deposits or accounts of which are insured by any agency of the Federal Government, or is made in whole or in part by any lender which is itself regulated by any agency of the Federal Government; or

(B) is made in whole or in part, or insured, guaranteed, supplemented, or assisted in any

The DIDMCA was enacted at a time when the market rate of interest was at unprecedented heights. As a result, the cost of money was approaching the rate ceilings established by state laws regulating lenders, even such rates as those allowed under laws like Pennsylvania's CDCA. Particularly concerned about the depressive impact that this development had upon housing starts and home-buying, Congress, in the DIDMCA, pre-empted federal law by deregulating home-finance interest rates. *See* 126 CONG.REC. H6966–67 (March 27, 1980); 126 CONG.REC. S7070–71 (March 28, 1980).

The DIDMCA includes a sunset provision, stating that, if a state, between April 1, 1980, and April 1, 1983, adopted a law declining to have the federal pre-emption apply, then the state regulatory provisions would again be effective. DIDMCA § (b)(2). *See In re Lawson Square, Inc.*, 61 B.R. 145, 149 (Bankr.W.D.Ark.1986). As far as we know, the Pennsylvania legislature, like that of Arkansas which the Court considered in *Lawson Square*, has not opted to override the pre-emptive aspects of the DIDMCA. However, this sunset provision reflects a Congressional prognostication that the conditions which made the DIDMCA seem appropriate at the time would not be permanent. This prognosis was of course accurate, and, by the beginning of 1987, interest rates have declined to the point where mortgages can be obtained, in the Philadelphia market, at rates about one-third of the CDCA rates. It is probably due to the fact that market conditions and competition have brought mortgage interest rates down naturally that the Pennsylvania legislature has not bothered to override the DIDMCA.

The foregoing overview of the DIDMCA is presented to explain the context in which

that legislation was enacted and thus identify the parameters in which it should be construed. The DIDMCA is hardly a Congressional expression of distaste with state usury laws generally, but a compromise with the ideals of such laws—that there should be limits upon rates of interest that lenders can legally charge—in a time of crisis. Moreover, the crisis has passed. Therefore, applying the DIDMCA to any transactions other than those which it is very clearly provided are within its scope would fail to recognize the context of this law in the scheme of the inter-relationship between federal and state law.

In the instant transaction, the Defendant, attempting to reap an even greater benefit than that to which it would have been entitled under the generous provisions of the CDCA, justifies its imposition of finance charges in excess of those permitted by the CDCA by arguing that the CDCA interest limits were pre-empted by the DIDMCA. It should be recalled, however, that only loans which the lender can prove fit within all of the requirements of the DIDMCA are in fact exempt from the confines of state-law interest rates. These requirements include a showing that a loan results in a transaction "secured by a first lien on residential property" and is a "federally related mortgage loan," as these terms are defined in 12 C.F.R. § 1735f–5(b) and the interpretive Regulations appearing at 12 C.F.R., Part 590 and interpretations thereof by the Federal Home Loan Bank Board.

■ We believe that, in order to invoke the DIDMCA, the Defendant must meet the burden of establishing that it is within the definitions of these terms. This is especially true because, as the Defendant points out, the Debtor needed the money so

---

way, by the Secretary of Housing and Urban Development or any other officer or agency of the Federal Government or under or in connection with a housing or urban development program administered by the Secretary of Housing and Urban Development or a housing or related program administered by any other such officer or agency; or

(C) is eligible for purchase by the Federal National Mortgage Association, the Govern-

ment National Mortgage Association, or the Federal Home Loan Mortgage Corporation, or from any financial institution from which it could be purchased by the Federal Home Loan Mortgage Corporation; or

(D) is made in whole or in part by any "creditor," as defined in section 1602(f) of Title 15, who makes or invests in residential real restate loans aggregating more than $1,000,000 per year.

badly that she might have paid any rate of interest to get it. It is precisely to protect consumers in such straits from over-reaching by lenders which has motivated the promulgation of usury laws, and this principle should not be sacrificed lightly.

■ We now turn to the record made on this issue to determine whether the Defendant has met its burdens under the DIDMCA. The pleadings contain very little enlightenment. In paragraph 17 of her Complaint, the Debtor alleges as follows:

17. The transaction at issue here was not a first lien loan on residential real property subject to the federal preemption of state usury limitations given at 12 U.S.C. § 1735f–7 because at the time of the transaction there were prior liens on debtor's residence.

To this, the Defendant pleads "17. Denied."

From the procedural history of the case, it will be recalled that the Defendant was accorded two opportunities by this Court to present evidence on any issue it deemed relevant. It declined to do so on both occasions. It was not until this case reached the briefing stage that the Defendant became aware of its shortfall, and attached, to its Brief, an Affidavit of its President, Jerry H. Silver, which states, in conclusory terms, that the Defendant regularly extends credit payable in four or more installments, "makes or invests in residential real property loans that aggregate more than $1,000,000 per year," and was engaged in "such activity" both at the time of the instant loan and at present.

The parties have directed a good deal of energy in addressing the issue of whether the instant loan was "secured by a first lien on residential real property," per § (a)(1)(A) of the DIDMCA. A considerable record has been made on this point, and it presents a nice question of law, i.e., whether, on one hand, the loan must be a purchase-money loan or one which, at the time it is made, has no secured liens on the property before it to fall within this definition; or, on the other hand, whether it will suffice to show that the instant loan would,

after the pay-off of City real estate taxes and water and sewer liens, become a first lien. There is, apparently, no case law addressing these issues anywhere in the country except *Mitchell v. Trustees of United States Mutual Real Estate Investment Trust*, 144 Mich.App. 302, 375 N.W.2d 424 (1985), wherein a Michigan state court, declining to read the "first lien requirement" of the DIDMCA broadly, holds that a wraparound mortgage, in which the consumer paid a loan company which in turn paid the consumers' first mortgage, was not a first lien, and hence the DIDMCA was inapplicable. It is, however, quite clear that the instant loan was not a wraparound mortgage, and hence only dictum in *Mitchell* can be cited as relevant here.

A simpler issue is presented by consideration of whether the Defendant has met the "federally related mortgage loan" requirement set forth in § (a)(1)(C) of the DIDMCA and 12 U.S.C. § 1735f–5(b). It seems clear that the loan issue does not fit within the types of loans described in § (a)(1)(C)(ii), (iii), (iv), (v), or (vi) of the DIDMCA or 12 U.S.C. § 1735f–5(b)(2)(A), (B), or (C). The only possibility is that the Defendant is within the scope of "creditors" described in 12 U.S.C. § 1735f–5(b)(2)(D).

We do not believe that the Affidavit of Mr. Silver, described at page 868 *supra*, is sufficient to constitute evidence on the record to satisfy the § 1735f–5(b)(2)(D) requirement of establishing that the Defendant makes or invests in residential real property loans that aggregate more than $1,000,000 annually. This is especially so, where, as here, the Defendant has been given repeated opportunities to present *evidence* on this or any other pertinent issue. It is clear to us that any "facts" relating to the scope and type of the Defendant's business is not "generally known," nor are they capable of accurate and ready determination, like the highest applicable interest rate which the Defendant could have charged under the CDCA. Therefore, we cannot, per F.R.Ev. 201(b), take judicial notice of the substance of this allegation.

Although the *Mitchell* court's decision might be characterized as ambiguous on its pronouncements relevant here to the "first lien requirement," it is totally clear on its pronouncements relevant to the "federally-insured mortgage" requirement. The failure of the lender there to prove that it regularly extended credit was held to have been fatal to the lender's case on this point. 375 S.W.2d at 432.

The *Mitchell* case is not alone in imposing upon the creditor the burden of proving that it falls within the scope of federal pre-emption because of the nature of its loan activity. All other known cases agree. *See Quiller v. Barclays American/Credit Inc.*, 727 F.2d 1067, 1071–72 (11th Cir. 1984), *reinstated*, 764 F.2d 1400 (11th Cir. 1985) (en banc); *Overton Construction, Inc. v. First State Bank, Springdale*, 281 Ark. 69, 662 S.W.2d 470, 471 (1984); and *First American Bank & Trust v. Windjammer Time Sharing Resort, Inc.*, 483 So.2d 732, 737–38 (Fla.App.1986).

Two factors further convince us that these courts are clearly correct in assessing the potential applicability of the DIDM-CA as a consequence of the creditor's loan activity as an affirmative defense upon which the Defendant has the burden of proof. *See* F.R.Civ.P. 8(c); *Howard v. Green*, 555 F.2d 178, 181 (8th Cir.1977); and *Superior Oil Co. v. Devon Corp.*, 458 F.Supp. 1063, 1071 (D.Neb.1978), *rev'd on other grounds*, 604 F.2d 1063 (8th Cir. 1979). First, it is clear that these issues are matters concerning which the Defendant has considerably more knowledge than the Debtor, and hence the means of proof are much more easily at its disposal. This is usually the primary consideration in assignment of the burden of proof. *See, e.g., In re Furlow*, 70 B.R. 973, 977 (Bankr.E.D. Pa., 1987); and *In re Fries*, 68 B.R. 676, 683–85 (Bankr.E.D.Pa.1986). Secondly, as analyzed below, the Defendant's invocation of federal pre-emption of otherwise applicable state law is an attempt to take advantage of an extraordinary dispensation. State usury laws were enacted due to the observation that desperate or unsophisticated borrowers might agree to any interest rate to get money. The Debtor here was both desperate and unsophisticated, to the extent where she might have accepted the terms of a loan shark. We are very reluctant to remove this protection from borrowers like the Debtor. Hence, the dispensation of removal of state regulation of interest rates should not be available to the Defendant unless its applicability can be strictly proven by the Defendant.

The only way that we could sustain the Defendant's position here is holding either: (1) The Debtor's specific averment in paragraph 17 of her Complaint referencing that only the "first lien requirement" of the DIDMCA was lacking can be considered a tacit admission that all other requirements of the Act are met; and (2) Mr. Silver's Affidavit can be considered as evidence. We cannot make either of these holdings, as they would be both unwarranted and improper.

Since the DIDMCA has not been proven available to the Defendant to pre-empt otherwise-applicable state usury law, we are therefore back to consideration of whether, under state law, the loan is usurious and how the pertinent Pennsylvania law, 41 P.S. § 502, provides that the penalty for usury shall be computed.

■ The sparse invocation of the Pennsylvania usury law by consumers, apparently flowing, as we explained at page 865 *supra*, from Pennsylvania's relatively lenient treatment of usurers, leaves us with but one authority on the issue of how to compute the penalty for usury per 41 P.S. § 502, a decision of the venerable jurist of the Delaware County Court of Common Pleas bench, the Honorable John V. Diggins, in *Trent Financial Corp. v. Church*, 12 Pa.D. & C.3d 451, 453 (Del.Co. C.P.1978). In that case, Judge Diggins deducted what he found was the "lawful amount of interest, payable at nine and one-half ($9\frac{1}{2}\%$) percent," apparently derived from 41 P.S. § 301, from the interest actually paid by the consumer, and trebled the difference. This procedure appears precisely what is contemplated by 41 P.S. § 502. It is, however, not entirely clear what is either the "lawful amount of interest" or the "interest actually paid" in the instant transaction.

The Debtor argues that the entire $5,118.00 paid by her to the Defendant must be considered as "interest actually paid," due to the fact that the principal of the loan originally was but $5,510.00, and the Defendant's Proof of Claim recites the Principal Balance of the loan, as of February 28, 1986, the date of filing, as $5,639.39, a figure *in excess* of the Principal Balance. It is not clear to us how the Defendant computed the Principal Balance set forth in its Proof of Claim. It certainly appears that it must have done so with the most liberal sort of measurements in its favor as could be conceived. It is not in the least disturbing to us to see the Defendant victimized by its own greed. We shall therefore accept the Debtor's contention that the entire $5,118.00 which she paid can be considered as "interest actually paid" by her.

However, we part company with the Debtor in her computation of the "lawful amount of interest" which could be paid. The Debtor argues that, since the loan in issue was not written pursuant to the CDCA, it was an otherwise unregulated transaction, and the "lawful rate" must be equated with the "legal rate" of six (6%) percent per annum established in 41 P.S. § 201. We do not agree.[3] If we followed this reasoning, we would always have to measure the "excess interest" by reference to the legal rate of interest, because any usurious loan will be, by definition, violative of the law under which it is written. If the Pennsylvania legislature had meant to measure the excess interest by subtracting the interest paid from the legal rate of interest, which is the ultimate result of the Debtor's argument, it would have simply said this. We also note that, in the *Church* case upon which the Debtor relies, Judge Diggins, without explanation of his reasons for doing so, measured the lawful rate at a figure above the legal rate (nine and one-half (9½%) percent).

We have already found that the maximum finance charge on a loan in which the principal was $5,510.00 and was financed for a thirty-nine (39)-month period under

the CDCA would have been $2,288.05. It would blink at reality to conclude that the Defendant, if it had known that it was unlawful to lend money to the Debtor at any figure in excess of the maximum allowable under the CDCA, would have failed to take advantage of that maximum—or that the Debtor would have hesitated in agreeing to pay the maximum. We therefore measure the "excess interest" by taking the difference between $5,118.00 and $2,288.05, arriving at a figure of $2,829.95.

While we read the language of 41 P.S. § 502 concerning treble damages as discretionary, we note that Judge Diggins, in *Church*, unhesitatingly computed the remedy for usury by trebling the excess interest paid by the consumer there. We find no equities in favor of the Defendant to cause us to do otherwise. We therefore find that the Defendant is liable to the Debtor in the amount of three times $2,829.85, or $8,489.55, on the Debtor's usury claim.

### 3. UDAP

■ Like most American jurisdiction, Pennsylvania has enacted a statute which is generically known as a law prohibiting and punishing "unfair or deceptive acts and practices," i.e., a UDAP statute, specifically the Unfair Trade Practices and Consumer Protection law, 73 P.S. § 201-1, et seq. (referred to hereafter as "UDAP"). The Debtor claims that the Defendant violated UDAP by requiring the Debtor to divert $300.00 from the loan proceeds to "mortgage brokers," Suburban Financial Services, Inc., and that, consequently, the Debtor is entitled to treble her actual damages caused by the deceptive practice, or receive damages of $900.00, under the terms of 73 P.S. § 201-9.2(a).

The only response of the Defendant is not that the diversion of the $300.00 was not deceptive, an argument difficult to make in light of the fact that the concealment of this diversion of these funds was so successful that even the Debtor's astute counsel did not initially detect it. Rather,

---

**3.** The Defendant, in its Brief, does not address the issue of the measurement of damages if the transaction should be found usurious, apparent-

ly placing all of its confidence in the court's concluding that the loan was not usurious.

it is that UDAP, and particularly 73 P.S. § 201–9.2(a), which covers transactions in which "[a]ny person … purchases or leases goods or services primarily for personal family or household purposes," does not cover "the lending of money," even when such lending is, as here, clearly for personal family or household purposes.

Analysis of this issue, like the issues discussed hereinbefore, causes us to once again step back and view Pennsylvania consumer protection legislation from a broad perspective.

Pennsylvania has regulated lenders since at least the early part of this century, having enacted the Small Loan Act, now repealed, 7 P.S. § 6151, et seq., in 1915. In 1937, it initially enacted the CDCA. In 1947, the legislature put into place the Motor Vehicle Sales Finance Act, 69 P.S. § 601, et seq. (hereinafter referred to as "MVSFA"), which regulated installment sales of motor vehicles. In 1963, it passed the Home Improvement Finance Act, 73 P.S. § 500–101, et seq. (hereinafter referred to as "HIFA"), to regulate financing transactions in the home-improvement field. Finally, in 1966, the legislature promulgated the Goods and Services Installment Sales Act, 69 P.S. § 1101, et seq. (hereinafter referred to as "GSISA"), which regulated the residuum of installment sales contracts not covered by the MVSFA or the HIFA. Then, in 1968, UDAP was passed, and, in 1976, 73 P.S. § 201–9.2 was added to UDAP to provide a private right of action to consumers for UDAP violations.

What is remarkable about this body of Pennsylvania consumer protection legislation is the absence of any specific section, except 73 P.S. § 201–9.2, which provides a private right of action for consumers aggrieved by most violations of these laws.

We do not believe that the Pennsylvania legislature, at least as of 1976, intended the result that consumers aggrieved by most violations of any of these laws should be left without a remedy. We therefore believe that, in enacting 73 P.S. § 201–9.2(a), the legislature meant to cure a potential defect in all of the foregoing legislation, and to provide consumers suffering actual damages as a result of violations of any of these acts with a private cause of action. Any substantial violation of these laws would certainly seem to us to constitute *per se* "fraudulent conduct which creates a likelilihood of confusion or of misunderstanding." *See* 73 P.S. § 201–2(4)(xvii).

Unfortunately, like many of Pennsylvania's consumer protection laws, UDAP has not been widely utilized, and therefore decisions addressing its scope, while not as scarce as those construing 41 P.S. § 502, have not been plentiful. However, those decisions which exist point towards the broadest possible interpretation of the scope of UDAP.

The leading appellate decision construing Pennsylvania's UDAP is *Commonwealth v. Monumental Properties, Inc.*, 459 Pa. 450, 329 A.2d 812 (1974). In ruling that UDAP covered landlord and tenant matters, a proposition which seems, if anything, more startling than the proposition that it covers consumer loans, the Pennsylvania Supreme Court held that UDAP was a remedial statute, which must be liberally construed to effect its objective of the protection of consumers in a broad range of activities. 459 Pa. at 457–78, 329 A.2d at 815–26.

Although, again, the case law is not great in number, what does exist is remarkably consistent. In *Commonwealth v. Tolleson*, 14 Pa. Cmwlth. 72, 122–24, 321 A.2d 664, 692–93 (1974), UDAP was extended to business transactions. In *Layton v. Liberty Mutual Fire Ins. Co.*, 530 F.Supp. 285 (E.D.Pa.1981) (per POLLAK, J.); and *Culbreth v. Lawrence J. Miller, Inc.*, 328 Pa.Super. 374, 477 A.2d 491 (1984), its scope was extended to the insurance industry, despite contrary arguments that legislation relating strictly to insurance transactions preempted the field.

However, perhaps the most analogous decisions were rendered by Pennsylvania trial courts in *Iron & Glass Bank v. Franz*, 9 Pa.D. & C.3d 419 (Alleg.Co.C.P. 1978); and *Commonwealth v. Nickel*, 26 Pa.D. & C.3d 115 (Mercer Co.C.P.1983). In *Franz*, the court held that a violation of a Federal Trade Commission Regulation con-

cerning preservation of consumer defenses, 16 C.F.F. § 433.1, was also a violation of UDAP. In *Nickel,* the court held that a violation of the federal TILA could be attacked by the state Attorney General through the medium of UDAP.[4]

As we indicated at the outset, we have designated the Pennsylvania law by the generic name of UDAP because it is a type of statute which many other states have enacted. In several other jurisdictions, appellate courts have met head-on on the contentions of lenders that UDAP statutes did not extend to loan transactions. In all of the cases of which we are aware, when these or similar arguments have been raised, they have been firmly rejected. *See Garland v. Mobil Oil Corp.,* 340 F.Supp. 1095, 1099 (N.D.Ill.1972); *State v. Brotherhood Bank & Trust Co.,* 8 Kan.App.2d 57, 649 P.2d 419, 421–23 (1982); and *Riverside National Bank v. Lewis,* 572 S.W.2d 553, 558–60 (Tex.Civ.App.1978).

Finally, the Debtor cites to a bankruptcy decision, *In re Dukes,* 24 B.R. 404, 410–13 (Bankr.E.D.Mich.1982), where the court held that the charging of a broker's commission to an unsophisticated consumer when the broker was the agent of a lender and hence did not actually have to search for the lender was a deceptive act entitling the debtor to the damages of recovery of the brokerage charge imposed under the Michigan UDAP. Moreover, there, the debtor executed a separate broker's agreement and hence the deception was restricted to the fact that the broker did not have to search for the lender. Here, the deception was far more pronounced, as the identity, role, and payment of the commission to Suburban Financial Services were all hidden from a similarly unsophisticated debtor.

The Defendant cites no authority from Pennsylvania or elsewhere suggesting that

this or any other UDAP does not cover loan transactions. The only authority cited by the Defendant on this point is *In re Joyce,* 41 B.R. 249 (Bankr.E.D.Pa.1984), a case in which former Chief Judge Goldhaber of this Court dismissed several UDAP claims, quite distinct from that claimed here, on their merits.[5] However, the fact that Judge Goldhaber considered these claims on their merits, as opposed to dismissing debtor's claims because they were outside of the scope of UDAP, supports rather than detracts from the stance of the Debtor here.

In sum, considering the interplay of the Pennsylvania consumer protection laws and the relevant analogous authority here and in other jurisdictions, we have no hesitancy in concluding that the Defendant's act of charging the Debtor $300.00 for a hidden broker's commission in a consumer loan transaction constituted a violation of the Pennsylvania UDAP which entitles the Debtor to damages pursuant to 73 P.S. § 201–9.2.

■ Although we believe that the language of this section concerning the imposition of treble damages is, like that of 41 P.S. § 502, discretionary, we conclude, as we did in considering the Debtor's usury claim, that there are little, if any, equities favoring the Defendant. We therefore conclude that the Debtor is entitled to $900.00 in damages as a result of her claim under the Pennsylvania UDAP.

4. RESPA

■ In her Amended Complaint, the Debtor added a cause of action for treble damages under 12 U.S.C. § 2607(d)(2) of RESPA, claiming that she had been charged a total broker's commission of $370.00 in violation of that Act. The Defendant answered, succinctly and we be-

---

4. There was no attempt by the Plaintiff here to extend the scope of the holdings in these cases by arguing that the Defendant's liability on the TILA actual damage claim, as well as perhaps even on the usury claim, could have been multiplied by a creative use of UDAP. Hence, the Plaintiff's use of UDAP is a modest one.

5. The principal contention of the *Joyce* debtor which Judge Goldhaber addresses in that case

was the claim that the Defendant, the same party defendant as in this case, misrepresented that it was Fidelity Bank, a lending institution from which the debtor there claimed that she could have received less expensive financing. It appears to us that, there, direct causation of a monetary loss resulting from deception of the consumer, which is present here, was absent, and was the sole reason for the result.

lieve correctly, that the applicable RESPA Regulations confine the application of RESPA to home-purchase transactions. *See* 24 C.F.R. § 3500.5(d)(2). This transaction was admittedly not a home-purchase transaction. Therefore, the Debtor is not entitled to any damages for any alleged violations of RESPA.

5. CONCLUSION/STATUS OF THE DEFENDANT'S PROOF OF CLAIM.

We conclude that the maximum amount which the Defendant could have legally claimed against the Debtor at the time of her bankruptcy filing was the total amount to which it would have been due for a loan in which the principal was $5,510.00, financed under the CDCA, for a period of thirty-nine months.

The calculation of the amount resulting from application of this method of calculating the Defendant's legal and legitimate total claim against the Debtor is as follows:

| | |
|---|---|
| Principal amount of Loan | $ 5,510.00 |
| Highest permissible finance charge | 2,288.05 |
| Other charges in loan (insurance, settlement costs) | 308.82 6 |
| Agreed attorneys fees and costs | 352.35 |
| TOTAL | $ 8,459.22 |

The Debtor is, however, entitled to credit of $16,997.55, itemized as follows:

| | |
|---|---|
| Payments | $ 5,118.00 |
| TILA Statutory Damages | 1,000.00 |
| TILA Actual Damages | 1,490.00 |
| Usury Damages | 8,489.55 |
| UDAP Damages | 900.00 |
| TOTAL | $16,997.55 |

Therefore, we must enter a judgment which features striking the Defendant's Proof of Claim in its entirety, and establishing the liability of the Defendant to the Debtor at the difference of the two figures, i.e., $8,538.33. As this sum appears to be in excess of the Debtor's exemption, we shall direct that this sum be paid by the Defendant to the Standing Chapter 13 Trustee, and for the Debtor to amend her Schedules and Plan to take this payment to her estate into account.

### ORDER

AND NOW, this 23rd day of April, 1987, consistent with the conclusions of the foregoing Opinion, it is hereby ORDERED AND DECREED as follows:

1. The Objections of the Debtor to the Proof of Claim filed by the Defendant, FIDELITY CONSUMER DISCOUNT COMPANY are SUSTAINED, and said Proof of Claim is hereby STRICKEN in its entirety.

2. Judgement is entered in favor of the Debtor and against the Defendant in the amount of $8,538.33. The Defendent shall pay the sum of $8,538.33 to the Standing Chapter 13 Trustee, JAMES J. O'CONNELL, ESQUIRE, within fifteen (15) days.

3. The Debtor is directed to file an Amended Chapter 13 Statement and Schedules to reflect the addition of the amount of this judgment to her estate within thirty (30) days from the date of this Order.

4. The Debtor's Counsel is accorded an opportunity to file a Motion requesting attorney's fees and costs, per 15 U.S.C. § 1640(a)(3), 41 P.S. § 503, and 73 P.S. § 201–9.2(a) within twenty (20) days hereafter, said Motion to be procedurally in conformity with *In re Meade Land and Development Co., Inc.*, 527 F.2d 280 (3d Cir.1975).

---

**6.** We recognize that these charges would possibly be decreased if the principal amount of the loan would be decreased. On the other hand, we recognize that the finance charge would ordinarily be imposed on the entire principal amount, which would generally include these charges. Adding this sum, without finance charges, appears to us a just compromise in estimating the sum which would have been appropriate in a comparable CDCA loan.